FILED
07/01/2026
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 17, 2026 Session

### IN RE BEAU M., ET AL.[1]

**Appeal from the Chancery Court for Rhea County**
**No. 2024-AD-1290          Melissa Thomas Willis, Chancellor**

_____

**No. E2025-01061-COA-R3-PT**
_____

This action involves the termination of a father's parental rights to his minor children. Following a bench trial, the court found that clear and convincing evidence established abandonment by failure to visit and that termination was in the best interest of the children. We reverse, holding that the record does not support the trial court's finding of clear and convincing evidence in support of the alleged statutory ground of termination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

JOHN W. MCCLARTY, P.J., E.S., delivered the opinion of the court, in which KRISTI M. DAVIS, and WILLIAM E. PHILLIPS, II, JJ., joined.

Matthew C. Rogers, Athens, Tennessee, for the appellant, Brandon M.

Joshua E. Hixson, Dayton, Tennessee, for the appellees, Alexandria and Mark B.

**OPINION**

## I.    BACKGROUND

Brandon M. ("Father") and Alexandria B. ("Mother") were married in 2013. Two children were born of the marriage: Beau, born in 2015, and Aycen, born in 2016 (collectively "the Children"). Mother and Father divorced in 2017 and adhered to an equal parenting schedule. Mother married Mark B. ("Stepfather") in 2020; they share one child together. Stepfather also has two children from a prior relationship. Father married Clarissa M. ("Stepmother") in 2021. Stepmother has four children from prior relationships.

_____

[1] This court has a policy of protecting the identity of children by initializing their last name in certain proceedings.

The equal parenting schedule continued until Mother petitioned for emergency custody following Father's arrest for a domestic dispute. Mother served as the primary custodian for approximately one year until they returned to an equal schedule.

In 2023, Stepmother petitioned for custody of another biological child, Olivia, who was born to Stepmother when she was 15 years old. Relatives adopted Olivia sometime after her birth in 2007. Stepmother alleged that Olivia was no longer safe in her adoptive home due to allegations of sexual abuse. Olivia came to live with Stepmother and Father.

In February 2024, Stepmother was charged with one count of commercial sex trafficking of a minor, six counts of facilitation of statutory rape, and one count of contributing to the delinquency of a minor—all charges stemming from a sexual relationship Olivia had with an older man, a friend that traveled with the family. As a result of these allegations, Father advised Mother that he had agreed to and signed an immediate protection agreement, placing the Children with Mother on a limited basis.

On February 12, 2024, Mother filed a petition for emergency custody, and on the same day, the court awarded Mother temporary custody, pending a full hearing.[2] The order did not provide Father with visitation. On April 9, the court granted Mother's petition and limited Father's contact to supervised visitation for four hours per week at Blended Recovery, "pending further hearing." The court also advised Mother to "unblock" Father's telephone number to facilitate contact between him and the Children. The order establishing supervised visitation was entered on May 2, 2024.

Father refused to visit the Children at Blended Recovery and repeatedly asked Mother for visitation outside of the facility. Mother refused. Father maintained contact with the Children by telephone. A re-hearing on the issue of custody was set for July 9. On the day of but prior to the time set for the July 9 hearing, Mother and Stepfather filed a petition to terminate Father's parental rights and for adoption of the Children by Stepfather. In support of their petition, they alleged one statutory ground: abandonment by failure to visit. The filing of the termination petition suspended the custody proceedings.

During the pendency of the proceedings against Father, the Tennessee Department of Children's Services ("DCS") filed a dependency and neglect petition against Stepmother with respect to her children. The General Sessions Court dismissed the petition. DCS appealed the decision to the Circuit Court, which found that DCS failed to prove its allegations of dependency and neglect. Notably, the court found Stepmother's testimony credible and held that Olivia had habitually accused others of sexual misconduct.

---

[2] The petition and order were inadvertently omitted from the record. Father has filed a motion to supplement the record to include these documents. No objection was filed in opposition to the motion to supplement. We hereby grant the motion and consider these documents as part of the record.

However, the criminal allegations against Stepmother were still pending by the time the termination petition filed against Father proceeded to a hearing on February 20, 2025.[3]

It is undisputed that Father refused to visit the Children at Blended Recovery after supervised visitation was established. Father texted Mother that he did not want to visit the Children at "some strange place." When asked if it was better to see his children at Blended Recovery than not see them at all, Father responded, "[h]ave you ever ate a sh** sandwich?" Father said that he also could not visit the Children at Blended Recovery due to work obligations and the need to care for Stepmother, who experienced some medical complications due to an assault perpetrated by Olivia. However, Father's employer, the paternal grandfather, testified that Father could have taken leave from work if necessary. Father and Stepmother also traveled to Florida together during the pertinent time period. He stated that he was "working on" a motion to modify the visitation arrangement and that the court hearing on July 9 was scheduled to review the visitation order.

Father admitted that he has been arrested as a result of violence toward Stepmother. He testified that he and Stepmother do not live together currently and that he is purchasing a new property where Stepmother will likely join him once he moves. Father testified that he did not believe the allegations against Stepmother. However, he assured the court that he would take any steps necessary to protect the Children, including abiding by a no-contact order with Stepmother during his co-parenting time, if restored. The guardian ad litem reported that the Children did not feel comfortable in the home with Stepmother.

Father stated that he attended anger management classes as a result of prior charges. He agreed that he does not work well with Mother as indicated by numerous social media posts directed to her attention. Exhibits entered at trial showed that Father also called his children "f*** trophies" on social media and posted vulgar comments about DCS.

When discussing her pending criminal charges, Stepmother maintained her innocence and said that the charges were based on Olivia's accusations that had been overwhelmingly rejected when DCS filed a dependency and neglect petition concerning her other children. She maintained that she currently lives in a different county than Father due to harassment from those in the community. She denied any current domestic violence issues with Father and stated that the Children were not home during their prior altercations. She agreed that the relationship was "not that great" in 2022 but claimed that they have since gone through counseling together and are now "doing fantastic."

Mother acknowledged that Father has maintained equal co-parenting time since their divorce, with the exception of the one-year period following his arrest in 2020. She stated that Father informed her of the situation involving Stepmother and Olivia and his decision to place the Children with her in accordance with an immediate protection

---

[3] The action was heard over the course of three days on February 20, March 28, and April 9, 2025.

agreement. She ultimately decided to file a petition for emergency custody once she received further information on the charges pending against Stepmother. She did not believe unsupervised contact between the Children and Father was best for them with Stepmother in the home. She alleged that there have been multiple instances of domestic violence between Stepmother and Father and that Stepmother regularly advised her of these instances of abuse. She identified several text message conversations between herself and Stepmother in which these instances were described in detail.

As to visitation, Mother agreed that Father visited "two or three times" at her house after the Children were placed with her in accordance with the immediate protection agreement. He refused to come back to her house for visitation after she filed the petition for emergency custody. Mother admitted that Father requested visitation outside of the Blended Recovery facility and that she referred Father to the court order. She admitted that she had blocked Father's telephone number prior to the court hearing because the Children were involved in the investigation of the charges filed against Stepmother. She unblocked Father's number when directed by the court. She agreed that Father regularly spoke to the Children after she unblocked his telephone number.

Mother initially agreed that she did not have concerns about Father's parenting or involvement with the Children if Stepmother were no longer in the home. However, she later clarified that she believed Father's behavior was concerning and that the multiple instances of domestic violence between him and Stepmother upset the Children. She claimed that the Children often experienced an adjustment period when returning from their co-parenting time with Father.

Stepfather confirmed Mother's assessment and claimed that the Children seemed happy. Stepfather testified that Father visited the Children at their house after Mother obtained emergency custody. The visits between Father and the Children were appropriate. He asserted that Father has not visited since the court hearing on April 9, 2024.

The paternal grandmother testified that she was routinely involved with the Children's care prior to the filing of the emergency custody petition. She explained that she was responsible for taking the Children to and from school during Father's co-parenting time. Father dropped them off at her house before he left for work and then returned to retrieve them from her home after work. She described a loving relationship between the Children and Father and stated that he was always engaged with them when they were at her house. She was more than willing to supervise visitation between Father and the Children. She claimed that Mother has not permitted her involvement with the Children since the filing of the emergency petition and that Mother advised her that she did not want Father involved with the Children anymore, stating that she would pack the Children up and move to Mexico before returning the Children to Father.

- 4 -

By order entered July 2, 2025, the court terminated Father's parental rights on the ground of abandonment by willful failure to visit, finding that he lacked credibility with regard to his alcohol and drug abuse and domestic violence in his home. The court also found that termination was in the best interest of the Children. This appeal followed.

## II.    ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.    Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

B.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Children.

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing

evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957

S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV. DISCUSSION

### A. & B.

As indicated above, the trial court granted the termination petition based upon Father's alleged abandonment by failure to visit. Parental rights may be terminated for abandonment when a parent fails to visit a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit "means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute requires that parents offer their children more than "token visitation," defined as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

A parent may assert as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that his or her failure to visit was not "willful." Tenn. Code Ann. § 36-1-102(1)(I). The burden is on the parent asserting the defense to prove by a preponderance of the evidence that his or her failure to visit was not willful. *Id.*; *In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *5 (Tenn. Ct. App. Nov. 26, 2019). It is well established in Tennessee that "a parent who attempts to visit and maintain relations with his or her child but is thwarted by the acts of others and circumstances beyond the parent's control has not willfully abandoned the child." *In re John A.*, No. E2020-00449-COA-R3-PT, 2021 WL 32001 at *7 (Tenn. Ct. App. Jan. 4, 2021) (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citation omitted) (upholding termination when the father did not take court action to secure visitation like the parents in *In re A.M.H.*).

Here, the relevant four-month period is from March 9, 2024, through July 8, 2024. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (holding that the statutory four-month period covers four months preceding the day the termination petition was filed and does not include the day the petition was filed). Father states that he was actively pursuing his legal remedies to restore

the original equal co-parenting schedule when Mother filed the termination petition. He believes this fact is inconsistent with a finding of willful failure to visit the children. He further asserts that the court failed to consider his consistent contact with the Children during the abandonment period. Mother responds that Father was given structured, supervised access but simply refused to use it during the applicable time period.

The record in this action confirms that Father enjoyed an equal co-parenting schedule with the Children prior to February 2024. Likewise, the parties agreed that Father visited the Children multiple times between the filing of the immediate protection agreement and Mother's filing of the emergency custody petition, which resulted in enmity between the parties. Father's access to the Children was then restricted by the court's signing of the emergency custody petition on February 12, 2024. Father's legal visitation rights were not restored until the court's filing of the order establishing such rights on May 2, 2024. *See Sparkle Laundry & Cleaners, Inc. v. Kelton*, 595 S.W.2d 88, 93 (Tenn. Ct. App. 1979) ("A Court speaks only through its written judgments, duly entered upon its minutes. Therefore, no oral pronouncement is of any effect unless and until made a part of a written judgment duly entered."). While Father was given structured, supervised access to the Children, such access was not legally provided until approximately two months into the relevant time period. Father was also at the courthouse awaiting a re-hearing on the court's order regarding visitation when the termination petition was filed. Under these circumstances, we hold that the evidence presented failed to establish by clear and convincing evidence Father's abandonment of the Children by a willful failure to visit. We reverse this ground of termination. Having reversed the sole ground of termination approved by the trial court, we need not consider whether termination of Father's parental rights was in the best interest of the Children.

## V.    CONCLUSION

For the reasons stated above, we reverse the judgment of the trial court and remand for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed equally to the appellees, Alexandria and Mark B.

s/John W. McClarty

JOHN W. McCLARTY, JUDGE